IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No._____

JENNY-BETH DILLS,

    Plaintiff,

v.

ROCKY MOUNTAIN EYE CENTER, Inc.

    Defendant.

COMPLAINT AND JURY DEMAND

Plaintiff, by and through undersigned counsel, files this Complaint against Rocky Mountain Eye Center. ("RMEC")

**PARTIES**

1. Plaintiff Jenny Beth Dills ("Ms. Dills") is a Colorado resident who currently resides in Boulder County, Colorado.

2. Defendant RMEC is a Colorado corporation that at all times relevant to the allegations in this complaint was a person within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

**JURISDICTION AND VENUE**

1

3. Jurisdiction is proper in this Court pursuant 42 U.S.C. §§ 2000e-5(f)(3) and 28 U.S.C. § 1331 and pursuant to the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. 126 § 12101 *et seq*.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) as Defendant is located in the District and the events giving rise to this suit occurred in the District of Colorado.

## ADMINISTRATIVE PROCEDURES

5. Ms. Dills timely filed a charge of discrimination against Defendant with the Colorado Civil Rights Division ("CCRD") (CCRD No. FE-2018312757) and with the United States Equal Employment Opportunity Commission ("EEOC")(EEOC No. 32A-2017-00647).

6. The CCRD issued a "Notice of the Right to Sue" on October 2, 2018.

7. This action has been timely commenced within ninety (90) days of Ms. Dills' receipt of the "Notice of the Right to Sue."

8. Therefore, Ms. Dills has complied with all jurisdictional, administrative and legal prerequisites to filing this action.

## SPECIFIC ALLEGATIONS

9. Defendant RMEC is a comprehensive family eye center with nine locations in southern Colorado and northern New Mexico. Defendant employs about 170 people including board certified ophthalmologists and optometrists who diagnose, treat and prevent diseases of the eye. Defendant also performs vision exams and prescribe vision correction products including eyeglasses, contact lenses and LASIK vision correction surgery.

10. On August 30, 2016, Ms. Dills began her employment with RMEC as a Ophthalmic Assistant (AKA Ophthalmic Technician).

11. Throughout her employment, Ms. Dills' job duties including assisting the doctors in patient care, patient "work-ups", communicating with patients regarding follow up care, performing refractions, lensometry, karatomery, muscle tests and the like.

12. During her employment, Ms. Dills' performed her duties sufficiently and was disciplined once, for a poor reaction to overhearing a supervisor talking negatively about her.

13. Ms. Dills had no attendance issues prior to taking leave.

14. In an effort to continue her education, on January 30, 2017, Ms. Dills passed the Joint Commission on Allied Health Personnel in Ophthalmology exam, becoming a Certified Ophthlamic Assistant.

15. Sometime in December 2016, Ms. Dills suffered a panic attack while at work.

16. Ms. Dills had previously been diagnosed with Post Traumatic Stress Disorder ("PTSD") and Generalized Anxiety Disorder ("GAD").

17. Realizing that she needed treatment, Ms. Dills contacted Human Resources ("HR") on March 30, 2017 to ask RMEC's policy on leave surrounding a potential ADA covered condition.

18. Ms. Dills returned to HR on April 5, 2017 and spoke to Rhonda Mitchell about taking leave and any paperwork that might be needed for a reasonable accommodation of her health conditions.

19. RMEC sent paperwork to Ms. Dills' therapist at Associates for PsycoTherapy ("APT") on April 6, 2017.

20. Ms. Dills took approved leave to deal with her PTSD and GAD from April 10, 2017 through April 23, 2017.

21. While Ms. Dills was on leave, RMEC received her completed request for a reasonable accommodation. This paperwork was completed by Dr. Thomas Tafoya at APT.

22. Dr. Tafoya suggested as a reasonable accommodation that after the period of leave, Ms. Dills be placed on a reduced schedule that included a 4 day or 32 hour work week, 4 hour maximum work up schedule and a limit of 2 days a week in triage. There was also a provision that allowed Ms. Dills to drive her own car when she was scheduled at locations other than her home location. RMEC would not be responsible for mileage.

23. The initial period of accommodation began on April 24, 2017 and had a tentative end date of May 22, 2017 with a required re-evaluation on or near May 22, 2017.

24. RMEC agreed to this reasonable accommodation.

25. While she was on leave, Ms. Dills requested short-term disability paperwork from RMEC.

26. On April 25, 2017, Ms. Dills returned to work and immediately began showing symptoms of her conditions.

27. On April 25, 2017, Ms. Dills went to Rhonda Mitchell in HR and complained that several co-workers were talking about her and her health condition behind her back.

28. On May 3, 2017, Ms. Dills misread the work schedule and thought she was off work. She was told by her supervisor to stay at home.

29. On May 11, 2017, Ms. Dills' manager, Bridget Gonzalez, and HR's Rhonda Mitchell coached Ms. Dills about tardies at work. Ms. Dills had clocked in late on May 8 and May 11. During that meeting, Ms. Dills requested additional training.

30. On May 17, 2017, Ms. Dills went to HR and complained that she was frustrated with RMEC and some of her co-workers.

31. Earlier that day, one of her co-workers, Rochelle Redinger, said, "Snitches get Stitches," as Ms. Dills walked by.

32. The next day, May 18, 2017, Ms. Dills contacted managers Josette Abron and Bridget Gonzalez and stated that she needed to additional time off work and information about short-term disability.

33. After work, Ms. Dills approached her direct supervisor Brigdet Gonzalez in the RMEC parking lot again regarding leave and short term disability.

34. Ms. Dills was told that she would have to speak to HR on May 19, 2017.

35. On May 19, 2017, Ms. Dills arrived at RMEC to meet with HR at 8 am, which was the next time that Ms. Mitchell was available.

36. Ms. Dills spoke to Rhonda Mitchell about the need for additional leave and short-term disability to address her medical condition.

37. Before she could address Ms. Dills' leave request, Ms. Mitchell found that manager Bridget Gonzalez made the decision to allow Ms. Dills time off for personal reasons.

39. The time off was scheduled from May 19, 2017 through May 30, 2017.

38. While Ms. Dills was in HR, Ms. Mitchell told her that, "she really needed to think about working at RMEC as it seems *sic* she does not enjoy it and has issues with most people she comes in contact with."

39. Ms. Mitchell also told Ms. Dills that she needed additional paperwork from her therapist.

40. Ms. Mitchell further questioned Ms. Dills about returning to work without restrictions.

41. RMEC referred to Ms. Dills' reasonable accommodation as a "restriction."

42. Ms. Dills explained that she did not see the APT therapist until May 25.

43. Ms. Mitchell noted that Ms. Dills would be out of town on the date of her appointment.

44. Ms. Mitchell told Ms. Dills that RMEC needed the additional paperwork from her therapist to grant an additional leave period.

45. Ms. Mitchell also told Ms. Dills that she would need to be on leave for 30 days before she would qualify for short-term disability.

46. Ms. Dills attempted to contact her therapist after speaking to Ms. Mitchell and was told the therapist was out of the office until May 25, 2017.

47. Ms. Mitchell then contacted an attorney connected to RMEC to discuss Ms. Dills and her accommodations and the RMEC disciplinary process.

48. On May 25, 2017, Ms. Mitchell emailed several managers and RMEC administration regarding a phone call she received from Ms. Dills stating that the therapist at APT had released her to return to work.

49. During the call, Ms. Mitchell requested a written release from Ms. Dills therapist.

50. The same day Ms. Dills sent a text to her supervisor Brigdet Gonzalez asking for her schedule for the following week.

51. Ms. Gonzalez sent a copy of the schedule to Ms. Dills and asked about Ms. Dills returning to work restriction free. Ms. Gonzalez told Ms. Dills to bring paperwork from her doctor regarding the lack of work restrictions.

52. On May 30, 2017, Ms. Dills returned to work at RMEC. She was scheduled to work at the Southside clinic.

53. Southside clinic was not Ms. Dills home clinic.

54. On May 31, 2017, a complaint came into RMEC's HR office regarding Ms. Dills work at the Southside clinic.

55. That day, Ms. Dills was called into the HR office to meet with Rhonda Mitchell, supervisor Josette Abron and manager Bridget Gonzalez.

56. During the meeting the three women "confronted" Ms. Dills about the allegations in the complaint filed against her.

57. Specifically, RMEC staff wanted to know if Ms. Dills had refused to help when she was asked to by co-workers. They also wanted to know if she had painted her nails, why she did not work up as many charts as the two other techs and if she took a call around 3pm.

58. Ms. Dills denied that she declined to help other RMEC techs on May 30, 2017.

59. Ms. Dills admitted to fixing a spot on her nails during her lunch break and she admitted to taking the time to call her therapist during a down time. Ms. Dills stated that she was attempting to get the paperwork RMEC had previously requested from her and the therapist regarding her reasonable accommodations.

60. Rhonda Mitchell was able to determine that Ms. Dills worked up approximately half the number of patients as other techs on duty during the 8-hour period she was scheduled.

61. The amount of patients worked up by Ms. Dills was in line with her reasonable accommodation.

62. Ms. Dills was sent home while Rhonda Mitchell, Bridget Gonzalez and Josette Abron made a decision about her employment.

63. At 11:30 am, Ms. Dills was called back to RMEC's HR office and told that she was being terminated from RMEC for unprofessional behavior (which included unexplained unprofessional behavior, rudeness towards co-workers and not working up an appropriate of patients).

64. The meeting became hostile.

65. During the termination, Ms. Dills stated that she had not been released from her reasonable accommodations.

66. RMEC had not received any paperwork from either Ms. Dills or APT regarding Ms. Dills release from accommodations.

67. Ms. Dills also felt her termination was in retaliation for her reporting co-workers and doctors for doing things that violated HIPPA and and put patients in harms way.

68. Ms. Dills timely filed a claim for unemployment benefits. Benefits were denied initially, but Ms. Dills appealed.

69. On July 17, 2017, a hearing was held by the Colorado Department of Labor and Employment's Division of Unemployment Insurance ("CDLE")

70. CDLE found that RMEC terminated Ms. Dills because they believed she was rude to co-workers and failed to "work up" a sufficient number of patients.

71. CDLE determined that RMEC failed to observe Ms. Dills ADA restrictions on May 30, 2017 and that RMEC failed to meet its burden to prove that Ms. Dills was discharged for a disqualifying reason.

72. RMEC did not appeal CDLE's decision.

73. Ms. Dills timely filed a charge of discrimination with the Colorado Civil Rights Division.

### FIRST CLAIM
### Americans with Disabilities Act of 1990 (ADA), as amended,
### 42 U.S.C. 126 § 12101 et seq. (Disparate Treatment)

74. Ms. Dills hereby incorporates by reference all previous paragraphs as though fully set forth herein.

75. A disparate treatment claim arises when an employer takes adverse action, including termination, against an employee because of her disability.

76. Ms. Dills's PTSD and GAD diagnosis and treatment was known to the Defendant.

77. Ms. Dills' PTSD and GAD medical conditions substantially limited one or more of her major life activities, including, but not limited to, working, concentrating, eating, sleeping, and caring for herself.

78. Ms. Dills was able to perform the essential functions of her position with reasonable accommodations.

79. At all relevant times, Ms. Dills was a qualified individual with a known or perceived disability so defined by the ADA.

80. Defendant took adverse action against Ms. Dills due to her disability, including effectively denuding her request for a reasonable accommodation in the form of the schedule provided by her therapist and terminating her for not performing outside of her accommodations.

81. Based on information and belief, Defendant accommodated other employees when necessary.

82. Defendant intentionally engaged in unlawful employment practices and policies in violation of the Americans with Disabilities Act of 1990, when it took adverse employment actions against Ms. Dills, including termination.

83. Defendant's actions complained of herein were intentional and done with malice or with reckless indifference to Ms. Dills federally protected rights.

84. As a result of Defendant's unlawful employment practices, Ms. Dills has suffered economic and non-economic damages including, but not limited to, severe emotional distress, mental pain and suffering, inconvenience and loss of income.

**SECOND CLAIM**
**Americans with Disabilities Act of 1990 (ADA, as amended,**
**42 U.S.C. 126 § 12101 et seq.,**
**(Failure to Accommodate)**

85. Ms. Dills hereby incorporates by reference all previous paragraphs as through fully set forth herein.

86. A failure to accommodate claim arises under the ADA when an employer fails to meet its legal obligation to reasonably accommodate an employee with a known disability.

87. At all relevant times, Ms. Dills was a qualified individual with a known or perceived disability as defined by the ADA.

88. Defendant knew of Ms. Dills' qualifying disability of PTSD/GAD and treatment.

89. Ms. Dills requested a reasonable accommodation in the form a reduced work schedule.

90. Defendant failed to fully engage in the interactive process by prematurely requiring a return to work without restrictions.

91. Defendant denied Ms. Dills request for reasonable accommodation by terminating her employment.

92. Defendant intentionally engaged in unlawful employment practices or policies in violation of the Americans with Disabilities Act of 1990 by taking adverse employment actions in retaliation for her complaints of discrimination.

93. Defendant's actions against Ms. Dills were intentional and done with malice or with reckless indifference to her rights.

94. As a result of the Defendant's unlawful employment practices, Ms. Dills has suffered economic and non-economic damages including, but not limited to, severe emotional distress, mental pain and suffering, inconvenience and loss of income.

WHEREFORE, for the reasons stated above, Ms. Dills respectfully requests that this Honorable Court enter a judgment for Ms. Dills as follows:

a. An award of actual damages in the amount to be determined at trial, including lost wages, and

 b. Non-economic damages for emotional distress, mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, back pay and front pay;

 c. An award of exemplary or punitive damages;

 d. An award of reasonable attorneys' fees and costs;

 e. An award of Ms. Dills pre-and post-judgment interest; and

 f. Ordering such other and further relief as this Court deems just and proper.

## JURY DEMAND

Ms. Dills hereby demands a jury on all issues so triable.

Respectfully submitted this 28th Day of December 2018.

      By: /s/   Tasha A. Steward
         Tasha A. Steward
         Law Office of Tasha Steward, LLC
         3570 E. 12th Ave
         Denver, CO 80206
         Phone: (720) 772-6145
         Facsimile: (720) 815-3884
         Email: tsteward@tstewardlaw.com